UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| ROSALIND EVANS-DEAN, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | Case No. 4:10CV01334 AGF |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | ) | |
| Defendant. | ) | |

# MEMORANDUM AND ORDER

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Rosalind Evans-Dean was not disabled and, thus, not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, or Supplemental Security Income ("SSI") under Title XVI of the Act, *id.* §§ 1381-1383f. For the reasons set forth below, the decision of the Commissioner shall be reversed and remanded.

Plaintiff, who was born on July 17, 1970, filed her applications for benefits on September 19, 2007, at the age of 37, alleging a disability onset date of July 14, 2007, due to mental impairments, including hearing voices. After Plaintiff's application was denied at the initial administrative level, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Such a hearing was held on July 8, 2009, after which Plaintiff amended her alleged onset date to September 10, 2007. By decision dated

August 26, 2009, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform her past work as a house cleaner, and was therefore not disabled. Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on May 24, 2010. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record as a whole. Specifically, Plaintiff argues that the ALJ improperly discredited the opinions of Plaintiff's treating psychiatrist and treating therapist. Plaintiff further argues that the ALJ erred in evaluating her credibility and subjective complaints, unreasonably evaluating Plaintiff's daily living activities as being inconsistent with disability. Plaintiff asks the Court to reverse the Commissioner's decision, and either award Plaintiff benefits or remand the case to the Commissioner for further proceedings and a new decision.

## BACKGROUND

### Work History

On her application for benefits, Plaintiff wrote that her most recent jobs were as a residential instructor and client attendant trainee at residential care facilities. Before that, she worked as a house cleaner for several years for different companies. (Tr. 77.) Earnings records show that she earned approximately $10,000 to $17,000 from 1991 through 2007. (Tr. 143.) Plaintiff wrote that she stopped working on September 2, 2007,

because she could not focus on her work.

**<u>Medical Record</u>**

On August 19, 2007, Plaintiff, who reportedly had had no previous psychiatric history, came to the emergency room ("ER") with complaints of hallucinations and abdominal pain. She exhibited psychotic behavior and was admitted to the hospital for one day. Plaintiff denied drug and alcohol use, but she tested positive for cocaine and marijuana. Examination revealed that Plaintiff had "severe acute pancreatitis possibly related to severe alcohol dependence, cocaine dependence as well as benzodiazepine dependence and cannabis dependence." Plaintiff was treated with antipsychotic drugs and discharged with an assessment of "[p]robable cocaine-induced psychosis/delirium." It was noted that she smoked one pack of cigarettes a day. (Tr. 309-13.)

On September 2, 2007, Plaintiff presented to the ER, asking that a doctor "check out [her] head." She had been hearing voices that caused her to yell out things, and had blurry vision. Plaintiff was diagnosed with affective psychosis and prescribed Zyprexa. Inpatient psychiatric care was recommended. She tested negative for all drugs except marijuana. (Tr. 266-86.)

On September 8, 2007, Plaintiff was seen in the ER again, with complaints of hearing voices that told her they wanted to hurt her. She also experienced migraine headaches and loss of sleep because of the voices. Plaintiff was evaluated with apparent paranoia; acute schizophrenia was suspected, although onset of schizophrenia was noted to be atypical at 37 years old. A nurse's note states that Plaintiff asked how much time

the doctor might indicate she should stay off work, for purposes of claiming leave under the Family Medical Leave Act. (Tr. 296-303.)

On September 10, 2007, Plaintiff established case with psychiatrist Aqeeb Ahmad, M.D. Plaintiff reported hearing voices, which got worse six weeks ago. There appears to be a reference to "voodoo charm in June." She denied alcohol and drug use, and reported sexual abuse by her father at the age of 12. Dr. Ahmad diagnosed psychotic disorder and possible late-onset schizophrenia, and a Global Assessment of Functioning ("GAF") score of 41,[1] and prescribed Abilify. (Tr. 326-28.) On September 24, 2007, Plaintiff was still hearing voices, her mind was racing, she could not sleep, had a headache, and felt stressed. Dr. Ahmad assessed a GAF score of 55 and he increased Plaintiff's dosage of Abilify. (Tr. 325.)

On November 1, 2007, state agency consulting psychologist Terry Dunn, Ph.D., completed a Psychiatric Review Technique form, on which he indicated in check-box format that due to psychotic disorders and substance abuse disorders, Plaintiff had moderate functional limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, and no episodes of

---

[1] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 31-40 indicate "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment.

decompensation of extended duration. (Tr. 329-40.)

On a separate Mental RFC Assessment completed the same day, Dr. Dunn indicated that Plaintiff had marked limitations in the ability to understand, remember, and carry out detailed instructions; moderate limitations in the ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and maintain socially appropriate behavior; and no significant limitations on all other areas of mental activities, such as maintaining attention and concentration for extended periods, and completing a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 329-43.)

On November 19, 2007, Plaintiff went to the ER, complaining that she was hearing voices that people were trying to kill her. She denied suicidal and homicidal ideation. Diagnoses included schizoaffective disorder and depression. She was prescribed Abilify and Cogentin and referred to a mental health clinic. (Tr. 349-57.) Plaintiff began seeing Licensed Clinical Social Worker Thomas Irwin at the clinic on January 2, 2008. She reported that she continued to hear voices and had difficulty sleeping because of them. Recent memory was poor and her affect was flat. Plaintiff was diagnosed with possible major depressive disorder with psychotic features, and was assigned a GAF score of 40. (Tr. 396-400.)

Plaintiff returned to Dr. Ahmad on January 19, 2008. She reported that she continued to hear voices, had decreased concentration and energy, and had lost her job because she could not focus. He discontinued Abilify and prescribed Seroquel and

5

Temezepam. (Tr. 411.) On February 16, 2008, Dr. Ahmad noted that Plaintiff experienced paranoia, and assessed a GAF score of 51. (Tr. 410.) On March 13, 2008, Plaintiff complained to Dr. Ahmad that the Seroquel was not working and that the voices were coming back and obstructing her sleep. Dr. Ahmad changed her medications and assigned a GAF score of 45. (Tr. 409.) On March 29, 2008, Plaintiff was having auditory hallucinations and was diagnosed with bipolar psychosis with a GAF score of 50. (Tr. 408.) On April 16, 2008, Dr. Ahmad wrote that the Plaintiff was crying uncontrollably; that the voices were trying to hurt or kill her and she was very upset; and that she listed the names of the voices. Plaintiff's mood was depressed and she had decreased concentration and energy. Dr. Ahmad diagnosed schizoaffective disorder, severe mental illness, and a GAF of 35. (Tr. 407.) Treatment notes from three subsequent visits with Dr. Ahmad, in May, June, and July 2008, report continued auditory hallucinations, and diagnoses of schizoaffective disorder with chronic insomnia and GAF scores of 35 to 45. At the May 14, 2008 visit, Plaintiff asked Dr. Ahmad for Percocet to help her sleep. (Tr. 404-06.)

On July 20, 2008, Plaintiff presented to the ER for evaluation of bizarre behavior and hallucinations. Plaintiff's mother, who had called 911, reported that Plaintiff had become increasingly paranoid and heard voices telling her that people were trying to kill her, and that Plaintiff wanted to hurt everyone. Plaintiff reported that her medication had not gotten rid of the voices and so she stopped taking it. Plaintiff tested negative for all controlled substances. She was given an injection of Geodon and admitted to the hospital

6

with a GAF score of 30. Upon discharge on July 24, 2008, Plaintiff was prescribed Lithium, Haldol, Cogentin, and Trazodone. Discharge diagnoses included schizophrenia and a GAF score of 50. (Tr. 414-17, 423-45.)

On June 16, 2009, Mr. Irwin evaluated Plaintiff in connection with her application for disability benefits. He opined that due to her mental condition, she would be unable to secure and maintain employment presently and during the ensuing 12 months. He assessed Plaintiff with poor or no useful ability to deal with work stresses and to be attentive/concentrate; fair (seriously limited) to poor ability to behave in an emotionally stable manner or relate predictably in social situations; and fair ability to complete 11 other work-based activities, such as following work rules and functioning independently. (Tr. 446-48.)

**Evidentiary Hearing of July 8, 2009** (Tr. 27-82)

Plaintiff, who was represented by counsel, testified that she was separated from her husband, and had an eight-year old daughter with whom she lived in a small house. Her husband came by regularly to check on her and their daughter and to pay the rent. Plaintiff had completed 12 years of education, was 5' 6" tall, and weighed 260 pounds. She could read and write, and do simple arithmetic. She was currently on Medicaid.

After summarizing her work history, Plaintiff stated that she had been hearing voices since July 14, 2007, and that somebody had "put some voodoo" on her. She could still hear the voices telling her that they wanted to kill her. Plaintiff explained that these voices interfered with being able to function at work. She was currently taking Zyprexa,

7

Trazodone, Ambien, and Entrin. In addition to the voices, Plaintiff had headaches "all the time," for which she took over-the-counter medication.

Plaintiff testified that her husband cooked the meals for their daughter, but that she cooked some light meals. She attended church three times a week, and did the laundry with the help of relatives. Her husband did the grocery shopping.

Plaintiff stated that she had used marijuana and cocaine in the past -- the last time she used these drugs was in 2007 -- and that she never had an alcohol problem. When questioned by the ALJ about the record indicating probable cocaine-induced psychosis and delirium, Plaintiff stated that she did not understand this diagnosis as that had nothing to do with her hearing voices.

Plaintiff testified that her current medications caused blurry vision and weight gain. She had a driver's license, but only drove about three times a month to and from her mother-in-law's house (which was around the corner and where her husband was living). She testified that she cleaned dishes, helped with the laundry, took the trash out, but did not vacuum or do yard work. Her hobbies were reading and listening to gospel music.

Upon questioning by her attorney, Plaintiff described the voices as starting suddenly between 3:00 and 4:00 a.m. on July 14, 2007. A female voice came out of nowhere and said something that Plaintiff could not remember. The voices had not stopped since that day, even with the medications. The voices told her that they would harm her, hurt her, kill her every day, all day. She said that they watched her go to the

bathroom, watched her work, and watched her daughter get ready for school in the morning.

Plaintiff testified that she knew one of the voices personally and that his name was Elmer Lamont Davis, Sr., who was a friend who she had last seen in 2006, when he was walking down the street with bumps on his mouth; she gave him some medicine and he later put a "voodoo" on her in 2007. Plaintiff knew this because the voices told her that Elmer Lamont had a picture of her that he had used. She knew the names of the other voices, but did not know these people personally.

Plaintiff testified that she had to distance herself from everyone and did not go to family events anymore because the voices bothered her too much. The only place she went was to her mother-in-law's house because she did not feel safe going anywhere else. Plaintiff stated that she felt comfortable at church, but the voices bothered her there as well.

Plaintiff testified that she stopped working in September 2007 because the voices became very bad and Dr. Ahmad advised her to take medical leave. She explained that she did not see Dr. Ahmad from June 2008 until June 2009 because she had no money or health insurance. Her Medicaid had expired and it took that long to get it started again. She testified that she was currently seeing Dr. Ahmad and Mr. Irwin, and that her medications were not helping with the voices. Plaintiff explained that the voices affected her relationship with her daughter because her daughter did not want to be around her anymore since she did not do anything. Plaintiff did not feel comfortable doing things

with her daughter because the voices followed her everywhere.

The ALJ then asked the Vocation Expert ("VE") to consider an individual of Plaintiff's age, education, training, and work experience, who did not have any exertional limitations; could understand, remember and carry out at least simple instructions to non-detailed tasks; could perform some complex tasks; and could demonstrate adequate judgment to make simple work-related decisions. The VE testified that such an individual could perform all of the jobs that Plaintiff had worked at in the past. The VE testified further that if the person could maintain concentration and attention for only two-hour segments over an eight-hour period, could respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others was only casual and infrequent, and could respond appropriately to customary work pressures, such an individual could perform Plaintiff's past housekeeping jobs, but none of Plaintiff's other past jobs because those required more than casual contact with others. An inability to maintain concentration and attention for two-hour segments of an eight-hour period would preclude all competitive employment.

**ALJ's Decision of August 26, 2009 (Tr. 9-19)**

The ALJ found that Plaintiff had the severe impairments of psychotic disorder, cocaine dependence, and cannabis dependence. He found that Plaintiff's mental impairments did not meet the requirements for a deemed-disabling impairment listed in the Commissioner's regulations. The ALJ then found that Plaintiff had the RFC to perform the full range of work at all exertional levels with the following nonexertional

10

limitations: she could maintain concentration and attention for only two-hour segments over an eight-hour period; could respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others was only casual and infrequent; and could respond appropriately to customary work pressures.

In explaining this RFC assessment, the ALJ stated that Plaintiff's allegations concerning the intensity, persistence, and limiting effects of her symptoms were "not entirely credible." The ALJ stated that Plaintiff never told any of her physicians about the "voodoo" curse that she testified about. The ALJ also believed there were inconsistencies between the daily activities Plaintiff reported on her application for benefits (caring for her daughter, taking her to school, going for walks, helping with homework, driving, attending church, and doing household chores) and her testimony at the hearing that she needed help with these things. The ALJ stated that Plaintiff's psychotic symptoms improved when she was taking medications. He then noted that there were periods of no treatment, but no evidence that Plaintiff tried to seek free or low-cost psychiatric care, along with evidence that she could afford to smoke a pack of cigarettes a day, rendering Plaintiff's assertion that she did not seek treatment for a period of time due to lack of resources unconvincing. The ALJ also found that Plaintiff's inquiry on September 8, 2007, regarding time off under the FMLA, her request for Percocet on May 14, 2008, and her smoking habit all detracted from her credibility.

The ALJ stated that with respect to the opinion evidence in the record, he accepted the opinions of Dr. Dunn (dated November 1, 2007). He did not evaluate the weight to

11

be accorded to Mr. Irwin's June 16, 2009 assessment of Plaintiff's mental impairments. Based upon the VE's testimony, the ALJ found that Plaintiff could perform her past work as a house cleaner.

## DISCUSSION

**Standard of Review and Statutory Framework**

In reviewing the denial of Social Security disability benefits, a court "must review the entire administrative record to 'determine whether the ALJ's findings are supported by substantial evidence on the record as a whole.'" *Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011) (citations omitted). The court "'may not reverse . . . merely because substantial evidence would support a contrary outcome.' Substantial evidence is that which 'a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted); *see also Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (explaining that the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal by the reviewing court).

To be entitled to benefits, a claimant must demonstrate an inability to engage in substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to

determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). A special technique is used to determine the severity of mental disorders. This technique calls for rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. Otherwise, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed-disabling impairments listed in Appendix I. If not, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work. If so, the claimant is not disabled. If she cannot perform her past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's vocational factors -- age, education, and work experience. *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). Here, the ALJ determined at step four that Plaintiff could perform past relevant work.

**Weight Accorded to the Opinion of Plaintiff's Treating Sources**

Plaintiff argues that the ALJ improperly gave no weight to Dr. Ahmad's treatment notes and GAF assessments during the time that he was her treating psychiatrist, from September 2007 until July 2008; and improperly gave no weight to Mr. Irwin's June 16, 2009 assessment.

The weight to be given to a medical opinion is governed by a number of factors including the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the source's opinion, and whether the source is a specialist in the area. 20 C.F.R. § 404.1527(d). The ALJ is to give a treating medical source's opinion on the issues of the nature and severity of an impairment controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* § 404.1527(d)(2). The statements of a treating physician may be discounted, however, if they are inconsistent with the opinions of other physicians, the claimant's testimony, or the overall record. *Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011); *Medhaug v. Astrue*, 578 F.3d 805, 815-16 (8th Cir. 2009).

Mr. Irwin's assessment is considered "other medical evidence." 20 C.F.R. § 404.1513(d)(1). In determining what weight to give "other medical evidence," the ALJ has more discretion and is permitted to consider any inconsistencies found within the record. 20 C.F.R. § 404.1527(d)(4); *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir.

2005) (explaining that therapist's assessment is to be treated as "other medical evidence" rather than as a treating source opinion). Even though Mr. Irwin's opinion was not entitled to treating source weight, his opinion was entitled to consideration as other medical evidence in the record. *See Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006).

Here, as noted above, the ALJ did not address the evidentiary value of Mr. Irwin's assessment. Nor did the ALJ explain why Dr. Ahmad's low GAF assessments were not reliable. The Eighth Circuit has recognized that generally a GAF of 50 and under would preclude an individual from finding any work. *See, e.g., Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003).

Rather, the ALJ merely stated that of the opinion evidence, he credited that of Dr. Dunn, a non-examining consultant. To be sure, an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments, including those by consulting sources, are supported by better or more thorough medical evidence. *See Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000). But here, it can hardly be said that Dr. Dunn's assessment from November 1, 2007, was supported by better or more thorough medical evidence than Dr. Ahmad's GAF assessments through July 2008. This is especially true given the date of Dr. Dunn's assessment and the more recent statements of Mr. Irwin and Dr. Ahmad. In light of the above, the Court concludes that the ALJ failed to justify his decision through a showing of substantial evidence. *See Conklin v. Astrue*, 360 F. App'x. 704, 707 (8th Cir. 2010) (reversing and remanding an ALJ's

15

disability determination in part because the ALJ failed to consider the claimant's GAF scores of 35 and 40); *Pate-Fires v. Astrue*, 564 F.3d 935, 944-45 (8th Cir. 2009) (holding that RFC findings were not supported by substantial evidence on whole record, in part due to the ALJ's failure to discuss or consider numerous GAF scores below 50).

**Assessment of Plaintiff's Credibility**

Plaintiff also argues that the ALJ erred in relying on Plaintiff's minimal daily activities to support the ALJ's finding that Plaintiff's allegations of disability were not credible. The Court agrees. The ALJ appears to have relied upon a perceived inconsistency between Plaintiff's testimony about her daily activities and her daily activities as she reported them in connection with her application for benefits. The Court, however, discerns no meaningful discrepancy. Nor does the Court believe that the level of activities testified to or reported by Plaintiff supports a finding in this case that Plaintiff could engage in substantial gainful activity.

Other reasons given by the ALJ for discrediting Plaintiff's testimony are also somewhat problematic. The Court does not believe that Plaintiff's FMLA inquiry or request for Percocet to help her sleep provide a persuasive basis for finding her testimony not credible. And any reliance placed by the ALJ on Plaintiff's supposed failure to tell her treating source about the "voodoo" placed on her was inappropriate in light of the reference to voodoo in Plaintiff's initial visit with Dr. Ahmad.

In sum, the Court does not believe that the ALJ's decision is supported by substantial evidence. Ordinarily, when a reviewing court concludes that a denial of

disability benefits was improper, the court, out of "abundant deference to the ALJ," should remand the case for further administrative proceedings; remand with instruction to award benefits is appropriate "only if the record overwhelmingly supports such a finding." *Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000) (citations omitted). Here, the Court does not believe that there is overwhelming evidence that would warrant an order that benefits be awarded. Rather, the Court believes the ALJ should be granted a chance to more fully consider the evidence of record, and possibly further develop the record by obtaining the opinion of a medical expert.

## **CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and this case is **REMANDED**.

A separate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 9th day of September, 2011.